Jason R.N. Monteleone, ISB No. 5441
Jacob D. Bottari, ISB No. 9556
JOHNSON & MONTELEONE, L.L.P.
350 North Ninth Street, Suite 500
Boise, Idaho 83702
Telephone: (208) 331-2100
Facsimile: (208) 947-2424
*jason@treasurevalleylawyers.com*
*jake@treasurevalleylawyers.com*

Attorneys for Plaintiff

**IN THE UNITED STATES DISTRICT COURT**
**IN AND FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| STEVEN MEREDITH, as Personal Representative of the ESTATE OF JEREMY STEVEN MEREDITH, deceased, and individually as the natural father and heir to JEREMY STEVEN MEREDITH, deceased,<br><br>Plaintiffs<br><br>v.<br><br>WARDEN TYRELL DAVIS, in his official and individual capacities, IDAHO DEPARTMENT OF CORRECTION, ASHLEY HAMMOND, L.C.S.W., CHARLES MILES, CORIZON, L.L.C., and JOHN/JANE DOES I through X, whose true identities are presently unknown,<br><br>Defendants | **Case No.**<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

COMES NOW the above-named Plaintiffs, Steven Meredith, individually and as the Personal Representative of the Estate of Jeremy Steven Meredith, (collectively, "Plaintiffs"), by and through their attorneys of record, Johnson & Monteleone, L.L.P., and, for their causes of action for damages against the above-named Defendants, state, aver, plead, and allege as follows:

**PARTIES, JURISDICTION, AND VENUE**

1. Plaintiff, Steven Meredith, as the Personal Representative of the Estate of Jeremy Steven Meredith, and individually as the natural father and heir to Jeremy Steven Meredith is now, and at all times relevant herein was, a resident of Meridian, Idaho; Steven Meredith was the natural father of Jeremy Steven Meredith, deceased, who died from suicide on January 12, 2021, and which is the subject of the instant action.

2. Plaintiff, the Estate of Jeremy Steven Meredith, is the decedent's estate created by operation of statute, as Jeremy Steven Meredith died intestate; Steven Meredith has petitioned and has been appointed as the personal representative of the Estate of Jeremy Steven Meredith, a deceased person.

3. Defendant, Warden Tyrell Davis ("Warden Davis"), was at all relevant times herein acting under the color of state law as an employee and warden of the Idaho Maximum Security Institution and its medical unit. Warden Davis is sued in his individual and official capacities.

4. Defendant, Idaho Department of Correction ("IDOC"), is a state agency which provides correctional services throughout the state of Idaho.

5. Defendant, Ashley Hammond ("Hammond"), is a licensed clinical social worker who was/is an agent and/or employee of Defendant IDOC at all times relevant to this action and who resides in the state of Idaho.

6. Defendant, Charles Miles ("Defendant Miles"), is/was a correctional officer who is/was and agent and/or employee of Defendant IDOC, who was involved in the supervision and safety oversight of Jeremy Steven Meredith, and who resides in the state of Idaho.

7. Defendant, Corizon, L.L.C., in addition to the Corizon Defendants are private corporations or other business organizations contracted by Defendant IDOC to provide medical

services to prisoners housed at IMSI. These Defendants include all corporate entities, including, but not limited to, Corizon, L.L.C., who was a contractor for the state of Idaho for the provision of healthcare services at Idaho Maximum Security Institution ("IMSI") as well as other state correctional facilities throughout Idaho at all times relevant to this action.

8. John/Jane Does I through X, whose true identities are presently unknown, Defendants, are now, and at all times relevant to this action were, entities or individuals who were the agents, employees, independent contractors, subdivisions, franchisees, wholly-owned subsidiaries, or divisions of the Defendants herein, or are the entities or individuals acting on behalf of, in a master/servant or principal/agent relationship with, or in concert with defendants named herein.

9. The United States District Court in and for the District of Idaho has jurisdiction over Plaintiff's federal claims pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1331, and 28 U.S.C. § 1343(a)(3).

10. The United States District Court in and for the District of Idaho is an appropriate venue, pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTIONS

11. Plaintiffs reallege the preceding paragraphs as though fully set forth *in haec verba*.

12. At all relevant times, Jeremy Steven Meredith, deceased, was 37 years old and was incarcerated at the Idaho Maximum Security Institution ("IMSI") located at 13400 South Pleasant Valley Road in Kuna, Idaho, and operated by Defendants IDOC and Warden Davis.

13. Jeremy Steven Meredith suffered from longstanding mental health conditions, including schizoaffective disorder and bipolar disorder, which were well-known to Defendants at all times relevant to this action. In fact, Defendants were aware of Jeremy Steven Meredith's prior criminal history, which included multiple instances wherein Jeremy Steven Meredith was placed on mental holds because he was suffering from mental health crises. Defendants were also aware of Jeremy Steven Meredith's diagnoses of Schizoaffective Disorder, Attention Deficit Disorder, and Asperger's/Autism Spectrum Disorder, and his repeated course of suicidal conduct and acts of self-harm throughout his incarceration at IMSI. Jeremy Steven Meredith was repeatedly placed on suicide watch throughout his incarceration at IMSI.

14. In 2021, due to Jeremy Steven Meredith's suicidal behaviors and repeated course of suicidal conduct, including acts of self-harm, Defendants placed Jeremy Steven Meredith on suicide watch on numerous occasions and assigned Jeremy Steven Meredith inmate companions to monitor his behavior.

15. In early January 2021, Jeremy Steven Meredith was placed on suicide watch due to his severe mental health conditions, repeated course of suicidal conduct, and acts of self-harm. While on suicide watch in the Medical Unit, Jeremy Steven Meredith was observed on multiple occasions attempting to hang himself with various items of clothing. Jeremy Steven Meredith engaged in a wide manner of bizarre behavior and activities while he was on suicide watch, which included abrupt and aggressive exercise, dancing, tying white clothing around his neck, hitting the walls and windows, and constantly making loud grunting and burping noises. He was noted to have been getting little to no sleep while on suicide watch and was making non-sensical statements to Defendants. During this time period, Jeremy Steven Meredith would consistently ask Defendants for his medications, but, when offered, would often refuse to take the medications.

After Jeremy Steven Meredith would refuse to take his medications, Defendants would thereafter refuse to give him the necessary medications, because "…[H]is opportunity was gone."

16. On January 9, 2021, Jeremy Steven Meredith was found by his inmate companion to be exhibiting abnormal, suicidal behavior by tying an object around his neck on several instances from 11:10 a.m. to 11:50 a.m., which the inmate companion communicated to Defendants. This conduct was also documented in his inmate companion's logbook, including a notation that Jeremy Steven Meredith attempted to hang himself with his underwear that day. However, Defendants failed to document this behavior in their logbooks and failed to report such behavior to their supervisors or medical clinicians on staff.

17. On that same date, Defendant Miles also observed Jeremy Steven Meredith's suicidal conduct, including tying white clothing around his neck and hitting the walls and window with his body but failed to document this conduct in his logbook and/or report these instances of self-harm to his supervisors, other coworkers, or medical clinicians on staff.

18. In the morning of January 10, 2021, Defendant Hammond evaluated Jeremy Steven Meredith prior to his release from suicide watch in the medical unit. Upon information and belief, Jeremy Steven Meredith told Defendant Hammond that he was suicidal and did not want to be released back to his cell. Jeremy Steven Meredith told Defendant Hammond that he would kill himself, if Defendant Hammond released him back to cell. Despite Jeremy Steven Meredith's suicidal behaviors and clear statement that he would kill himself, if Defendant Hammond released him back to his cell, Defendant Hammond released Jeremy Steven Meredith from suicide watch in the medical unit and had him returned back to his isolated cell in Cell Block C.

19. At approximately 9:30 a.m. on January 10, 2021, Defendants removed Jeremy Steven Meredith from suicide watch in the medical unit and placed him in segregation in Cell

Block C, Cell 45. Jeremy Steven Meredith was isolated and housed alone in his cell despite the fact that he was a known to be a risk of suicide. Defendants failed to adequately monitor Jeremy Steven Meredith through continuous supervision and direct line of sight after returning him to his isolated cell. In fact, Defendants left Jeremy Steven Meredith alone in his isolated cell without any supervision for an extended period of time.

20. While Jeremy Steven Meredith was in his cell, he talked to a nearby inmate through the ventilation system. Jeremy Steven Meredith asked the inmate how he could kill himself and told the inmate that he was going to kill himself. The inmate pleaded with Jeremy Steven Meredith not to kill himself and to push his emergency button to call for Defendants' assistance. Jeremy Steven Meredith told the inmate that he was pushing his emergency button, but Defendants would not respond to his calls.

21. At approximately 10:30 a.m. on January 10, 2021, Jeremy Steven Meredith attempted suicide by hanging himself with a bed sheet.

22. At approximately 11:08 a.m. on January 10, 2021, Defendants found Jeremy Steven Meredith alive, hanging from a bed sheet tied to a top bunk in his cell.

23. After medical assistance was provided, Jeremy Steven Meredith was transferred to St. Alphonsus Regional Medical Center in Boise, Idaho, where he was treated medically but died from his injuries on January 12, 2021.

24. Following Jeremy Steven Meredith's suicide, Defendants conducted a Serious Incident Review ("SIR"), which revealed numerous violations of critical standard operating procedures ("SOPs") adopted by Defendants, including SOP 505.02.01.001—Inspection of Facilities and Facility Log Guidelines/Post Orders-Medical Officer and SOP 315.02.01.001—

Suicide Risk and Management and Intervention. The SIR Report issued by Defendants identified the following violations of Defendants' SOPs:

a. SOP 505.01.01.001—Inspection of Facilities and Facility Log Guidelines/Post Orders: "Mr. Meredith was found to be having abnormal behavior leading up to said incident, where it was noted by the inmate companion in his logbook on 1/09/2021 that Jeremy Meredith was tying an object around his neck on several instances during the times of 1110 hours to 1150 hours. However, this was not noted in the staff's behavior observation log regarding any of this behavior nor was it reported to the Shift Commander on duty. Noteworthy events will be logged in red ink and Medical Security Staff must maintain an accurate and detailed logbook. It does not appear that Inmate Meredith's engaging in self harm was documented. It is recommended that when self-harm and/or erratic behavior occurs it be specifically written. Watch log indicated broad terms up to interpretation such as 'acting out'."

b. SOP 315.02.01.001—Suicide Risk Management and Intervention: "Watch companions must maintain direct line of supervision of incarcerated individuals on non-acute suicide watch or close observation and must never engage in activity that would take away their ability to constantly monitor the incarcerated individual on a monitoring status. Staff are then responsible to ensure that watch companions follow this process. It appeared in the video that the watch companion just walked away from monitoring the door for bathroom breaks and/or to refill their coffee cup. It is recommended that

only staff refill their coffee cup and that watch companions ask the medical officer to use the restroom so that the medical officer can be the one to provide direct line of sigh while the watch companion uses the restroom and/or find someone else to provide the direct line of sight.

c. SOP 315.02.01.001—Suicide Risk Management and Intervention: "During close observation, staff members are responsible for oversight of the monitoring, and must visually observe the incarcerated individual at staggered intervals not to exceed 15 minutes. It is recommended that these checks be done visually cell side and not through camera footage at the officer station. This policy also states that watch companions must be able to obtain rapid staff assistance. It is advised that IMSI leadership discuss a way that a watch companion can make immediate contact with staff when an individual in engaging in self-harm behavior and staff are not present at the unit station.

d. SOP 315.02.01.001—Suicide Risk Management and Intervention: "Styrofoam cups are not allowed to stay in the cell while an offender is on suicide watch or close observation. Our findings showed that Mr. Meredith had a Styrofoam cup in his cell which he used to drink out of the toilet with. It is recommended that a Styrofoam cup be authorized on the suicide watch operation memo if Clinical Staff deem it safe for that patient to have it. This Field Memorandum also indicated that any concerns with an offender's behavior be reported to the Shift Commander and Clinician. From the SIR packet it does not appear that Shift Commander or Clinician was notified

when Mr. Meredith was actively engaging in self-harm behavior when on close observation.

25. As a result of the SIR, the SIR Board found, based on its professional judgement, that Defendants' officer(s) charged with supervising Jeremy Steven Meredith did not adhere to Defendants' SOPs. More specifically, the SIR Board found: "It is the panels [sic] opinion that Officer [redacted] did not respond according to SOP; he failed to log and report instances of self-harm to the Shift Commander and/or log it in the required behavior observation log for the Clinical staff to reference. He did not complete an information report regarding any incidents or behavior that day prior to leading up to the incident under review. Furthermore, when interviewed by the panel he contradicted himself at various times and concluded that he did not see Jeremy Meredith perform any acts of self-harm (putting a white cloth around his neck), but rather a 'Shift Commander' instructed him to place that in his report. When questioned about who instructed him, he stated he couldn't recall which Shift Commander told him about the incident and/or told him to include this in his information report."

26. As a result of the SIR, the SIR Board found that there were actions that should have been done and that can be done in the future to prevent suicides like that of Jeremy Steven Meredith's from occurring in the future. Specifically, the SIR Board issued the following opinion: "It is the panels [sic] opinion that in order to reduce the risk of similar incidents from occurring in the future, we can continue to ensure all screening, assessment and required follow ups are completed in accordance with standard operating procedures. Furthermore, there has been a recommendation made by Clinical staff to have a uniform process of storing, tracking, and maintaining the behavior observation logs that are completed by the companions on watch. The process should include review of both the companion and staff observation notes on said logs."

27. As a result of the SIR, the SIR Board found certain operational issues that existed with Defendants' "Companion Logs Process" at the time of Jeremy Steven Meredith's suicide. Specifically, the SIR Board issued the following finding: "It was noted by the panel that there is a discrepancy regarding Operational Issues. Companion Logs-Process is inconsistent and there is a need to establish a uniformed way to store, track, and maintain the behavior observation logs completed by the companions on watch. The process should include review of both the Companion and Staff observation notes on said logs daily, up to and as far back as the previous days Mental Health checks. A common area or designated space, folder, etc. to be able to have these readily available for staff to reference as needed."

28. As a result of the SIR, the SIR Board found Defendants had a policy and practice of not adequately training staff on Suicide Risk Management. In fact, four of the seven officers who were involved in the monitoring and supervision of Jeremy Steven Meredith had not received their Suicide Risk Management training within the required timeline.

29. At all times relevant herein, Defendants IDOC and Warden Davis, were legally responsible for the management of IMSI, including establishing and implementing policies, procedures, and protocols governing Suicide Prevention Programs and Intervention.

30. At all relevant times hereto, Defendants IDOC and Warden Davis, were legally responsible for screening, hiring, training, and supervising their employees.

31. As a direct result of Defendants' conduct, including their acts and omissions, Jeremy Steven Meredith committed suicide, which death was avoidable and wrongful.

## FIRST CAUSE OF ACTION
## (VIOLATION OF CIVIL RIGHTS PURSUANT TO 42 U.S.C. § 1983)

32. Plaintiffs reallege the preceding paragraphs as though fully set forth *in haec verba.*

33. This cause of action is asserted against all Defendants.

34. Defendants were acting under color of state law while Jeremy Steven Meredith was under their care and custody and deprived Jeremy Steven Meredith of certain rights, privileges, and/or immunities which were secured by the United States Constitution and other laws. This deprivation of rights, privileges, and/or immunities (i.e. Eighth Amendment, Cruel and Unusual Punishment—deliberate indifference to Jeremy Steven Meredith's serious, medical needs) caused Jeremy Steven Meredith's death and all resulting damages recoverable for his wrongful death.

35. As a direct result of Defendants' conduct, Jeremy Steven Meredith was incarcerated under conditions posing a substantial risk of serious harm and which ultimately resulted in his death. Defendants knew that Jeremy Steven Meredith presented a heightened risk of suicide and was particularly vulnerable to suicide based on his documented history of being placed on suicide watch, documented suicidal behaviors, and documented acts of self-harm in the months, weeks, and days leading up to his act of suicide. Despite Defendants' knowledge of the excessive risk to Jeremy Steven Meredith's safety, Defendants released him from suicide watch and placed him in an isolated cell without supervision.

36. Jeremy Steven Meredith's long history of severe mental illness, both prior to and during his incarceration at IMSI, including his suicidal ideations and acts of self-harm the day before and the day of his suicide, establish the threat to his health was objectively serious and that, if left untreated and unmonitored, Jeremy Steven Meredith was likely to suffer further significant injury, including but not limited to, suicide. Defendants knew that Jeremy Steven Meredith was at

a heightened risk of killing himself but consciously and deliberately disregarded the serious risk of harm that he posed to himself.

37. The acts and omissions of Defendants in denying medical care to Jeremy Steven Meredith violated the requirements of the Eighth Amendment rights held by Jeremy Steven Meredith from cruel and unusual punishment.

38. The specific actions of Defendants, acting under color of state law and also individually and/or in concert with each other, alleged to be violations of Jeremy Steven Meredith's protected, constitutional rights are more particularly set forth as follows:

a. Defendants knew that Jeremy Steven Meredith's presented a heightened risk of suicide and was particularly vulnerable to suicide based on his documented history of being placed on suicide watch at IMSI, documented suicidal behaviors, and documented acts of self-harm in the months, weeks, and days preceding his act of suicide. Defendants were aware of Jeremy Steven Meredith's severe mental illness based on his multiple instances of being placed on mental health holds prior to his incarceration at IMSI, but released him back to his isolated cell without supervision.

b. Defendants failed to do anything in response to the serious concerns presented by Jeremy Steven Meredith's inmate companion that Jeremy Steven Meredith was exhibiting abnormal, suicidal behavior including multiple instances of tying an object around his neck and trying to hang himself with his underwear on January 9, 2021.

c. Defendant Miles observed Jeremy Steven Meredith's suicidal behavior and attempted acts of self-harm on January 9, 2021, including but not limited

to, tying clothing around his neck as if he was going to hang himself, hitting the walls and windows with his body, engaging in abrupt and aggressive movements, constantly making loud grunting and burping noises, and making non-sensical statements, but failed to document this conduct in his log and report the instances of self-harm to the Shift Commander.

d. Defendants released Jeremy Steven Meredith from suicide watch in the Medical Unit despite his clear statement to Defendants that he would kill himself if they released himself back to his cell.

e. Defendants released Jeremy Steven Meredith from suicide watch in the Medical Unit into isolated confinement in Cellblock C, Cell 45, on January 10, 2021. Defendants' released Jeremy Steven Meredith's to isolated confinement despite his documented suicidal behavior and acts of self-harm on January 9, 2021 and his clear intentions to kill himself the morning of January 10, 2021.

f. Defendants left Jeremy Steven Meredith unattended and unsupervised for an extended period of time on January 10, 2021, after he was released from suicide watch despite the substantial risk of serious harm that he posed to himself.

39. The unreasonableness of Defendants' failure to provide adequate medical and mental health care under these circumstances is well-defined by existing law and by the established polices of IDOC and IMSI, and each Defendant knew or reasonably should have known that their conduct was not only well below the standard prescribed by law but was illegal and unconstitutional *per se*.

40. As a direct and proximate result of Defendants' deliberate indifference to Jeremy Steven Meredith's heightened risk of suicide, he killed himself.

41. As a direct and proximate result of Defendants' deprivation of the rights, privileges, and/or immunities due to Jeremy Steven Meredith, Plaintiffs have sustained both economic and noneconomic losses, including but not limited to, Jeremy Steven Meredith's funeral and burial expenses, medical expenses, expenses associated with medical, psychological and counseling care and expenses, emotional distress, loss of enjoyment of life and reasonable values attributable for the loss of the companionship, services, support, care, comfort and society due the death of Jeremy Steven Meredith. The amount of these damages to be proven with specificity at trial.

42. Plaintiffs are entitled to punitive damages against Defendants for their reckless and callous indifference to Jeremy Steven Meredith's federally protected rights.

43. Plaintiffs have been required to hire attorneys to represent them in this matter and thus are entitled to an award of reasonable attorney fees and costs pursuant to 42 U.S.C. § 1983.

## SECOND CAUSE OF ACTION
## (*Monell* Liability)

44. Plaintiffs reallege the preceding paragraphs as though fully set forth *in haec verba.*

45. This cause of action is asserted against Defendants IDOC and Warden Davis.

46. Defendants IDOC and Warden Davis either adopted a policy, had a longstanding practice or custom which constituted a policy, or ratified actions, which ratification amounted to a policy, in violation of Jeremy Steven Meredith's constitutional right to be free from cruel and unusual punishment and to be free from damages as a result of the concerted effort to deprive him of due process of law.

47. Defendants IDOC and Warden Davis had policies and procedures of action and inaction in which they violated Jeremy Steven Meredith's constitutional rights or instructed their employees to do so. The specific policies of action and inaction of Defendants IDOC and Warden Davis that are alleged to be a violations of Jeremy Steven Meredith's protected constitutional rights are more particularly set forth as follows:

a. Defendants IDOC and Warden Davis had a policy and practice of not training officers/staff on Suicide Risk Management. Four of the seven officers/staff involved in supervising and monitoring Jeremy Steven Meredith had not received their required Suicidal Risk Management and Intervention training within the timelines mandated by IDOC and the Warden.

b. Defendants IDOC and Warden Davis failed to exercise appropriate care in the hiring, training, and supervision of its officers/staff so as to ensure their officers would be capable of making informed and rational decisions in the course of performing their duties relative to Suicide Risk Management and Intervention, and implementing the SOPs for Suicide Risk Management and Intervention.

c. Defendants IDOC and Warden Davis failed to implement and/or enforce a policy requiring staff members to report instances of inmate self-harm and/or suicidal behavior to their supervisory and/or clinical staff.

d. Defendants IDOC and Warden Davis failed to implement and/or enforce a policy requiring staff members to document instances of inmate self-harm and/or suicidal behavior in an observation log for supervisory and clinical

staff to review and reference. Such a policy must require all documentation of instances of self-harm and/or suicidal behavior to be specific, detailed entries and general references such as "acting out" must be explicitly prohibited.

e. Defendants IDOC and Warden Davis failed to implement and/or enforce a policy requiring noteworthy events such as suicidal behavior and acts of self-harm to be documented in a conspicuous manner within the required logbooks.

f. Defendants IDOC and Warden Davis failed to implement and/or enforce a policy ensuring all Suicide Risk Management and Intervention screening, assessment, and required follow-ups are completed in accordance with SOPs.

g. Defendants IDOC and Warden Davis failed to implement and/or enforce a policy creating a uniform process of storing, tracking, maintaining, and accessing the behavior observation logs that are completed by inmate watch companions, including a requirement that clinical staff review both inmate companion logs and staff observation logs on a daily basis and up to as far back as the previous days mental health checks.

h. IDOC and the Warden failed to implement and/or enforce a policy requiring suicidal inmates and those who have attempted suicide to be evaluated by mental health care providers and/or transferred to mental health facilities.

i. Defendants IDOC and Warden Davis failed to implement and/or enforce a policy requiring: 1) evaluation of suicidal inmates or those who have

attempted suicide by a qualified mental health professional, who designates the inmate's level of suicide risk, level of supervision needed, and the need for transfer to an inpatient mental health facility or program; 2) regular reassessment of those inmates to identify any change in condition indicating a need for change in supervision level or required transfer or commitment; 3) and periodic follow-up assessment after the inmate's discharge from suicide precautions.

j. Defendants IDOC and Warden Davis failed to implement and/or enforce a policy prohibiting suicidal inmates from being released back to their

k. Defendants IDOC and Warden Davis failed to implement and/or enforce a policy prohibiting suicidal inmates from being placed in isolation unless constant supervision is maintained.

l. Defendants IDOC and Warden Davis failed to implement and/or enforce a policy requiring continuous monitoring of actively suicidal inmates who are housed alone in a room.

m. Defendants IDOC and Warden Davis failed to implement and/or enforce a policy requiring officers/staff to maintain continuous monitoring of suicidal inmates. Other supervision aids (e.g., closed-circuit television and inmate companions or watchers) can be used a supplement to continuous monitoring, but never as a substitute for staff monitoring.

48. Defendants IDOC's and Warden Davis's policies of action and inaction amount to deliberate indifference to the rights of Jeremy Steven Meredith and his medical needs.

49. Jeremy Steven Meredith would not have had the opportunity to commit suicide had Defendants IDOC and Warden Davis properly trained and supervised their officers/staff and implemented and/or enforced the above-referenced policies and procedures.

50. As a direct and proximate result of Defendants IDOC's and Warden Davis's policies of action and inaction, Jeremy Steven Meredith committed suicide and Plaintiffs have sustained both economic and noneconomic losses, including but not limited to, Jeremy Steven Meredith's funeral and burial expenses, medical expenses, expenses associated with medical, psychological and counseling care and expenses, emotional distress, loss of enjoyment of life and reasonable values attributable for the loss of the companionship, services, support, care, comfort and society due the death of Jeremy Steven Meredith. The amount of these damages to be proven with specificity at trial.

51. Plaintiffs are entitled to punitive damages against Defendants for their reckless and callous, deliberate indifference to Jeremy Steven Meredith's federally protected rights and medical needs.

52. Plaintiffs have been required to hire attorneys to represent him in this matter and thus is entitled to an award of reasonable attorney fees and costs pursuant to 42 U.S.C. §§ 1981, 1983, and/or 1988.

**THIRD CAUSE OF ACTION**
**(Wrongful Death Pursuant to I.C. § 5-311)**

53. Plaintiffs reallege the preceding paragraphs as though fully set forth *in haec verba.*

54. This cause of action is asserted against all Defendants.

55. As a result of Defendants' failure to provide medical care and/or to protect Jeremy Steven Meredith, he suffered a wrongful death, and his heirs, to wit, his father and decedent's estate are entitled to recover damages from Defendants for wrongful death.

56. As a result of Defendants' tortious, negligent, intentional, reckless, willful, wanton, and deliberately indifferent conduct, Jeremy Steven Meredith had an opportunity to commit suicide; as such, Defendants' acts and omissions were substantial factors in causing the death of Jeremy Steven Meredith.

57. As a direct and proximate result of the acts and omissions of Defendants, as well as their intentional, negligent, reckless, willful, and/or wanton conduct, Jeremy Steven Meredith committed suicide and Plaintiffs have sustained both economic and noneconomic losses, including but not limited to, Jeremy Steven Meredith's funeral and burial expenses, medical expenses, expenses associated with medical, psychological and counseling care and expenses, loss of the companionship, services, support, care, comfort and society due the death of Jeremy Steven Meredith. The amount of these damages will be proven with greater specificity at trial.

58. Plaintiffs have been required to hire attorneys to represent them in this matter and thus are entitled to an award of reasonable attorney fees and costs.

## PRAYER FOR RELIEF

WHEREFORE**,** Plaintiffs pray for judgment against Defendants as follows:

1. For the first and second causes of action, Plaintiffs pray for judgment finding that Jeremy Steven Meredith's protected, constitutional rights were violated;

2. For all causes of action, Plaintiffs' special and general damages in amounts which may be proven at trial;

3. For the first and second causes of action, an award of punitive damages;

4. For costs of the action incurred herein;

5. For an award of reasonable attorney fees to be determined by the Court; and

6. For such other and further relief, as this Court deems just, equitable, and proper.

DATED: This 23rd day of December, 2022.

JOHNSON & MONTELEONE, L.L.P.

*/s/ Jason R.N. Monteleone*
Jason R.N. Monteleone
Attorneys for Plaintiffs

**DEMAND FOR JURY TRIAL**

Pursuant to F.R.C.P. 38(b), Plaintiffs hereby demand a trial by jury on any and all issues properly triable by jury in this action.

DATED: This 23rd day of December, 2022.

JOHNSON & MONTELEONE, L.L.P.

*/s/ Jason R.N. Monteleone*
Jason R.N. Monteleone
Attorneys for Plaintiffs